Minshall, J.
The question in this case is, whether the . owner of land upon a natural stream of water, so situate that in times of flood it is overflowed by the superabundant water, may, to benefit his own lands, construct an embankment thereon, the natural and probable consequence of which must be, and is, at times of ordinary floods, to cause the swollen current to overflow, erode and destroy the lands of another proprietor thereon. We have so stated the question in this case, because, as we think, the question as to surface water is not involved in it.
The premises of the parties are situate upon a bend of the Muskingum river, those of the plaintiff being upon the exterior and those of the defendants upon the interior of the bend; the included lands being divided between. Rambo on the one side, and the Littles on the other, by a line running a little east of south. It is upon this line, beginning at a point about 180 feet south of low water mark on the interior bend of the river and extending some 2,900 feet thereon, that the embankment has been constructed by the defendants. It serves to protect the lands included by the bend from the violence of the current that flows across the same when the river is swollen by a flood; and was constructed by the united labor and expense of the defendants for their mutual benefit. It necessarily acts as a partial dam to the current when the river is swollen by floods; and, as avei’red, causes the flood water to flow over and upon *282 the lands of the plaintiff with destructive violence, doing him great damage at such times.
It is difficult to see upon what principle the flood-waters of a river can be likened to surface water. 'When it is said that a river is out of its banks, no more is implied than that its volume then exceeds what it ordinarily is. Whether high or low the entire volume at any one time constitutes the water of the river at such time; and the land over which its current flows must be regarded as its channel, so that when swollen by i’ains and melting snows it extends and flows over the bottoms along its course, that is its flood channel, as when, by droughts, it is reduced to its minimum, it is then in its low water channel.
Surface water is that which is diffused over the surface of the ground, derived from falling rains and melting snows, and continues to be such until it reaches some well defined channel in which it is accustomed to, and does flow with other waters, whether derived from the surface or springs; and it then becomes the running water of a stream, and ceases to be surface water.
So that, as we think, it is not material to inquire in this ease what the law is as to surface water, for the facts stated in the petition do not present such a case.
The maxim, Sic ntcre tuo ut alienum non leerlas, would seem to apply with peculiar propriety to a case like this. Each proprietor on a river has a right to the enjoyment of its waters as it flows by his premises,, and the right, also, to modify and limit its current upon his own property as will best subserve his own convenience and notions of propriety ; and he may, therefore, construct and maintain embankments thereon for the purpose of protecting any part of his lands from being injured by the overflow of the river in times of high water; but it is equally clear that this right to deal with the river and to control its current must be exercised with a just regard to the rights of others. He can not, by the construction of embankments or otherwise, divert the waters of the river from his own lands and cause them to flow over and upon those of his neighbor, to the *283 substantial injury of the latter, however beneficial it may be to his own lands, without violating this elementary maxim of justice. There is little or no difference in the authorities upon this subject. Thus, Angel in his work on Water-courses, section 333, says: “Ariparian proprietor may, in fact, legally erect any work in order to prevent his lands being overflowed by any change of the natural state of the river, and to prevent the old course of the river from being altered.” “ But,” he adds at section 334, “ a riparian proprietor for his greater convenience and benefit has no right to build any thing which, in time of ordinary flood, will throw the water ou the grounds of another proprietor so as to overflow and injure them.” To this may be added what is said by Wood in his work on Nuisances, section 350: “While it is true that a riparian owner may erect bulwarks to proteet his property from injury by the stream, yet they can only do this when it can be done without injury to others, either to an owner upon the opposite side of, or to those above or below him on the stream.” He then cites the case of Gerrish v. Clough, 48 N. H. 9, where the defendant had erected a breakwater upon his bank of the river to protect it from injury by the water, but the effect of this was to throw the water against the plaintiff’s laud upon the opposite side, and in high water his land was washed away, and the injury was held to be actionable. And so bin Valley Railway Co. v. Franz, 43 Ohio St. 623, it was held by this court, that “ a railway company, like an individual, may, on its own land and for its own benefit, lawfully cut a new channel for a stream of water, aud turn such stream into such new channel, if thereby no damage is caused to another; but when it so controls aud directs the course of the stream that . . . the water is thus thrown across the old channel and against and upon the land of another? and thereby causes damage to such other, the company is liable for such damage.”
The difference arises as to surface water. In some of the states the rule of the civil, and in others that of the common law, prevails. The. former requires each tenement to *284 submit to the conditions imposed on it by nature, so that the owner of a lower tract can not divert the water that flows to and upon his own from a higher one to the injury of the latter. This rule was recognized by this court in Butler v. Peck, 16 Ohio St. 334, and was adopted as the rule of its decision in Tootle v. Clifton, 22 Ohio St. 247.
The civil law acts upon the maxim that water is descendible by nature, and that its usual flow should not be interfered with, so that its burden, if it be one, should be borne by the land where it naturally flows, rather than by land where it can only be made to flow by artificial means. The common law does not recognize this principle as to surface water, but permits any one to protect his own premises from it as he may choose to do, without becoming liable to others injured thereby; or, ihore properly, it does not regard it as an injury to do so, whatever inconvenience or loss may result to others therefrom. It is not necessary, as we have said, to discuss the merits of either system in this case, as the injury complained of does not arise from au interference with the flow of surface water.
The maxim of the civil law, Aqua currit et debet currere ut currere solebat, applies generally to running water, in the common, as well as in the civil, law, subject to such reasonable qualifications as the interests of agriculture require and the enjoyment of private property will permit. Barkley v. Wilcox, 86 N. Y. 140. As each owner has the right to protect his own lands from the violence of the current, or to improve the same, by the erection of .embankments, and, as a rule, this can not be done without increasing to some extent the flow upon the opposite side, it follows that this must be permitted to some extent by all owning lands upon the stream, or the right can not be exercised by any one of them. Such a rigid application of the principle of the maxim would materially impair the interests of agriculture iu some, if not all, of the- most fertile valleys of the state, without any necessary requirement on the part, if not to the detriment, of private property.
It is true, as a rule, that every invasion of a private right *285 imports ail injury for which the law will allow a recovery of nominal damages at least, for the purpose of maintaining the right, and preventing the wrong from ripening into a right by lapse of time. Tootle v. Ctifton, supra; Sedg. Dam., ch. II.
As a rule the infringement of a right can be determined without regard to the damages that may have been occasioned, the injury and the damage being plainly separable. But this is not so plainly the case among riparian proprietors. They have a common right in and over the waters of the same stream, and the invasion of the individual right of one in the subject of their common enjoyment can not be determined until some act is clone by another that is in excess of the common right of all in the same subject. So that in such cases, before an action can be brought by one riparian proprietor against another for an infringement of the former’s right as such proprietor, he must show that he has been substantially damaged by the act of the latter. This was the rule applied to the deepening of waters in streams by mill-dams, in the cases of Cooper v. Hall, 5 Ohio, 320, and M’Elroy v. Goble, 6 Ohio St. 187; and was applied by analogy to the corrupting of air by smoke in Columbus Gaslight and Coke Co. v. Freeland, 12 Ohio St. 392. And we, see no good reason why it should not be applied in cases like the present, where an embankment is constructed by one for the protection of his land upon a stream, all others owning lands upon it having, for the same purpose, a like right; and the public having the same general interest in the encouragement of agriculture that it has in mills. The principles of an enlightened system of jurisprudence should be made to vary with circumstances, and be so. applied as to meet the wants and condition of a people. It is with this qualification that, as has been frequently observed by its courts, the common law has been adopted in this state.
But the argument of the learned counsel for the defendant, drawn from the interest of agriculture, goes too far, when, as they seem to claim, one private owner upon a stream may, for his own benefit, erect an embankment that will *286 cause its water in times of ordinary floods to overflow and destroy the lands of his neighbor. Unless this right to erect an embankment be limited, as above stated, what limit could be set to the exercise of a similar right in any other case? The right of private property, so carefully guarded in the fundamental law against public encroachment, might be wholly destroyed by that of individuals. If the general interests of agriculture require the taking of private property for the consti’uction of levees, there is ample power in the legislature to authorize this to be done by some general statute making provision for compensation to owners for damages sustained.
But as the effect of a cex’tain embankment acting upon the waters of a stream, when at its flood, can not be known with cex’tainty by a man of ordinary knowledge and skill until the experiment has been made, it must follow that when a px’opxdetor constructs an embankment for the benefit of his own land he should not be held liable for its unforeseen results to his neighbor, if at the time he constructed it he exei’cised the care and skill of an ordinarily skillful and intelligent man. It was upon this principle that the case of Railroad Company v. Carr, 38 Ohio St. 448, was decided. The duty, however', of a land-owner upon a river, in making changes thereon fox his own benefit, to exex’cise reasonable care and caution not to injure others, “ both in the inception and execution of the work,” and his liability to the party injrved for his omission to do so, is fully recognized in the first two propositions of the syllabus.
After, however, the occurrence of an ordinary flood has shown the tendency of the embankment at such times to occasion injury to an adjacent proprietor’, and that its effect at each recurring flood will be to cause additional injury, the duty on his part at once arises to obviate the cause of the injury; and if he fails to do so his liability, from such time must, upon principle, be the same as it would have been could he have foreseen the result in the first instance. He can not, by the exercise of care and dilligence in the first instance, acquire the right to continue a nuisance to *287 the lands of his neighbor. Care and dilligence iu constructing the embankment can only exonerate the party building it from such damages as were unforeseen at the time. The liability that may arise from a continuance of the cause of injury, after its character becomes apparent, was not presented in Railway Co. v. Carr, supra, as that action was simply brought for damages that had been occasioned to the crops of the plaintiff below, at the flood of August 1, 1875.
As to whether the plaintiff' is entitled to relief upon his second cause of action, it is sufficient to say, that in a proper case, on a final hearing, a decree may be entered for the abatement of a nuisance. But it necessarily depends upon a variety of circumstances, whether such a decree will be entered. In the first place equity requires that the plaintiff shall have acted with promptness in objecting, and in taking, steps to enforce his objection, upon receiving notice of the defendant’s structures and erections, which are sought to be abated, if the circumstances are such that the defendant would be unnecessarily prejudiced by the plaintiff’s delay; and the injury must be of a substantial and permanent nature, and not capable of an adequate compensation in damages. 3 Pom. Eq. Juris., § 1359. It is sufficient, however, in this regard, that the damages are of such constant and frequent recurrence, that no adequate compensation can be made thereby. Wood on Nuis., § 778.
Judgments reversed, and cause remanded to circuit court, with directions to overrule the demurrer to the amended petition, and for further proceedings.